

**SIGNED this 24 day of April, 2017.**

_____
John T. Laney, III
**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| In re: | * | |
| **ALPHA PROTECTIVE SERVICES, INC.,** | * | **Chapter 7** |
| Debtor, | * | **Case Number: 12-70482- JTL** |
| | * | |
| **NEIL C. GORDON, TRUSTEE,** | * | |
| Plaintiff, | * | |
| | * | **Adversary Proceeding** |
| v. | * | **Number: 14-07025** |
| | * | |
| **SECURITY ESSENTIALS, INC.,** | * | |
| as Initial or Immediate Transferee; | * | |
| **ALPHA CONSULTNG ENGINEERS, LLC,** | * | |
| f/k/a ALPHA CONSTRUCTION & | * | |
| ENGINEERING, LLC, f/k/a APS-ACE, | * | |
| LLC, as Initial Transferee or as conduit to | * | |
| Security Essentials, Inc.; | * | |
| Defendants. | * | |

_____

## MEMORANDUM OPINION

This Adversary Proceeding is before the Court on a Motion for Full or Partial Summary

Judgment ("Motion") filed by the Plaintiff, the Trustee. The Court has carefully considered

the pleadings and briefs, the parties' oral arguments, and the applicable statutes and case law.

For the reasons set forth below, the Court will GRANT partial summary judgment for the

Plaintiff.

## Procedural History

This Adversary Proceeding arises out of the underlying bankruptcy case of Alpha

Protective Services, Inc. (the "Debtor"). On April 12, 2012, the Debtor filed for Chapter 11

bankruptcy relief (the "Petition Date"). (Petition, Lead Case ECF No. 1). On December 20,

2012, the Court converted the Debtor's Chapter 11 case to a Chapter 7 case. (Order on

Conversion, Lead Case ECF No. 156). On April 1, 2014, the Trustee filed the above-captioned

adversary proceeding against the Defendant, Security Essentials, Inc. ("Security Essentials").[1]

(Compl., Adversary Proceeding ECF No. 1).[2] The Trustee filed the instant Motion on October

10, 2016. (Pl.'s Mo. for Full or Partial Summ. J., A.P. ECF No. 98). In his Motion, the Trustee

seeks full or partial summary judgment on Counts I, IV, V, and VI.[3] In Count I of his original

complaint, the Trustee sought to avoid and recover payments made to Security Essentials on or

within 90 days before the Debtor filed its petition as preferential under 11 U.S.C. § 547(b). In

Count I of his amended complaint, the Trustee sought to avoid and recover payments made

between 90 days and one year before the Debtor filed its petition as preferential payments to an

insider. In Count IV, the Trustee sought to recover post-petition payments made by the Debtor

to Security Essentials as unauthorized post-petition payments under 11 U.S.C. § 549. Lastly, the

---

[1] The Trustee also named Alpha Consulting Engineers, LLC, f/k/a/ Alpha Construction & Engineering, LLC, f/k/a APS-ACE, LLC ("ACE") in this Adversary Proceeding. ACE is in default, and the clerk's default has been entered on the docket. (Entry of Default, Adversary Proceeding ECF No. 15).

[2] The Adversary Proceeding Docket will be referred to hereinafter as "A.P."

[3] In Count II, the Trustee sought to recover payments made to Security Essentials within two years of the Debtor's filing its petition. He alleged that the payments were fraudulent transfers under 11 U.S.C. § 548. Furthermore, the Trustee sought in Count III to recover payments made within four years of the Debtor's filing its petition as fraudulent transfers under 11 U.S.C. § 544. The Trustee does not seek summary judgment on these Counts.

Trustee sought in Counts V and VI to recover payments from ACE to Security Essentials as the

initial or immediate transferee under 11 U.S.C. § 550(a).  On December 15, 2016, Security

Essentials filed a Response with Opposition to the Trustee's Motion ("Response"). (Def.'s Resp.

with Opp'n, A.P. ECF No. 110).  On January 12, 2017, the Trustee filed a Reply Brief. (Pl.'s

Reply Br., A.P. ECF No. 114).  On January 13, 2017, the Court held oral argument on the

Trustee's Motion and Security Essentials's Response.

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure ("Rule") 56,[4] the Court must "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  The Court must view the evidence in the

record "in the light most favorable to the non-moving party." *Jordan v. Clifton*, 74 F.3d 1087,

1090 (11th Cir. 1996). *See also Info. Sys. & Network Corp. v. City of Atlanta*, 281 F.3d 1220,

1224 (11th Cir. 2002) (noting that the court must "resolve all reasonable doubts about the facts in

[the non-moving party's] favor").  Additionally, the Court must draw "all justifiable inferences"

in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Under Rule 56(c), the party seeking summary judgment bears the burden of showing the

bankruptcy court the basis for its motion and "identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact" and warrant

a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

An issue of fact is material if it affects the outcome of the case as identified by

substantive law. *Anderson*, 477 U.S. at 248; *Redwing Carriers, Inc. v. Saraland Apartments*, 94

---

[4] Federal Rule of Civil Procedure 56 is made applicable to adversary proceedings by Federal Rule of Bankruptcy
Procedure 7056.

F.3d 1489, 1496 (11th Cir. 1996).  Therefore, the court will focus its analysis solely on factual

contentions that are relevant and necessary to the outcome of the case. *Id.*  A genuine dispute

exists if a reasonable fact finder could find in favor of the non-moving party based on the

evidence. *Anderson*, 477 U.S. at 248.  A genuine dispute means that "more than 'some

metaphysical doubt [exists] as to the material facts.'" *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986)).  If the nonmoving party "bear[s] the burden of proof at

trial on a dispositive issue," the nonmoving party must "go beyond the pleadings and by [its]

own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed.

R. Civ. P. 56(e)).

### Factual Background

Security Essentials is a security consulting firm wholly owned by its president, Paul

Hackenberry ("Hackenberry").  Hackenberry had a distinguished 35-year career in government

security that involved roles as Assistant Director of the United States Secret Service, Acting

Director of the Federal Law Enforcement Training Center, Director of Security of the

Transportation Security Administration at the Jacksonville International Airport, and Director of

Security for the 2004 G-8 Presidential Summit. (Hackenberry Aff. ¶¶ 2-7, A.P. ECF No. 112).[5]

In 2005, Hackenberry retired from government service and began his career in private security

consulting with the incorporation of Security Essentials. (Id. ¶ 10).

Hackenberry's business relationship with the Debtor began when he contracted the

Debtor to provide security for the G-8 Summit in 2004. (Id. ¶ 8).  In the years following the G-8

Summit, Hackenberry helped the Debtor secure numerous security contracts. (Id. ¶ 9, 11).

---

[5] The Adversary Proceeding Docket will be referred to hereinafter as "A.P."

Hackenberry maintained a business relationship with the Debtor, serving as both an independent

contractor and an employee at various times. (Id. ¶ 10-12).  In 2007, he became a member of the

Board of Directors of the Debtor. (Id. ¶ 23).  He served as a director at least until the filing of the

Debtor's petition on April 12, 2012. (Statement of Financial Affairs, at 7, Lead Case ECF No.

48).

In 2009, the Debtor contracted Security Essentials for its security consulting services.

Security Essentials provided such services for the years 2009 through 2012 and continued to

provide such services after the Debtor filed for Chapter 11 bankruptcy.  During 2011 and 2012,

the Debtor paid Security Essentials $7,500 per month for its services.  These payments were

made pursuant to an oral agreement between the Debtor and Security Essentials.  The parties did

not agree upon a specific date on which the Debtor was to make each monthly payment.

(Hackenberry Aff. ¶ 11, A.P. ECF No. 112).  The Debtor made the following payments to

Security Essentials from April 20, 2011 to April 20, 2012:

| Date of Payment | Payment Amount |
|:---:|:---:|
| 4/20/2011 | $7,500 |
| 5/17/2011 | $7,500 |
| 7/14/2011 | $7,500 |
| 8/29/2011 | $7,500 |
| 9/13/2011 | $7,500 |
| 10/12/2011 | $7,500 |
| 11/17/2011 | $7,500 |
| 12/22/2011 | $7,500 |
| 1/13/2012 | $7,500 |
| 1/27/2012 | $20,000 |
| 2/17/2012 | $7,500 |
| 4/12/2012 | $15,000 |

(Def.'s Resp. to Pl.'s First Req. for Admis. 9, 17, 25, 33, 41, 49, 57, 65, 73, 81, 89, & 97, A.P.

ECF No. 97-6; Hackenberry Dep. Ex. 1, A.P. ECF No. 89-2 (clarifying the amount of the

1/27/2012 transfer)).

The payment made on April 12, 2012 came from a check drawn on an Ameris Bank account in

the name of ACE, which is a Georgia limited liability company owned by Richard Singletary and

Kristen Horne. (341(a) Meeting Tr. 47:7-48:1, Lead Case ECF No. 687-2; Hackenberry Dep.

35:17-36:2, A.P. ECF No. 88-1; Hackenberry Dep. Ex. 11, A.P. ECF No. 90-6).  Singletary is a

friend of Brinson and Horne is Brinson's daughter. (*Id.*).  The Ameris account held by ACE was

a conduit for payments made by the Debtor to its creditors. (2004 Examination, Vol. II 196:4-17,

Lead Case ECF No. 654-2).

Beginning in February 2011, the Debtor used two Bank of America accounts; one

account was its general operating account and the other was its payroll account. (Schedules &

Statement of Financial Affairs, Lead Case ECF No. 48).  At some point prior to the Debtor's

filing of its petition, Bank of America froze the Debtor's general operating account due to a

garnishment from Omniplex World Services Corporation ("Omniplex"). (Rule 204 Examination

Tr. Vol. I. 51:10-21, Lead Case Docket 654-1).  The basis for the garnishment was a judgment

for $1,863,221.32 entered by the United States District Court of the Middle District of Georgia

on March 23, 2011. (Edwards Aff. Ex. E, A.P ECF No. 100-5).  By the end of 2010, the Debtor

owed the Internal Revenue Service ("IRS") $168,984.80 in Federal Insurance Contributions Act

("FICA") and withholding taxes. (Edwards Aff. Ex. C, IRS Proof of Claim, A.P. ECF No. 100-

3).  By March 31, 2011, the Debtor owed the IRS an additional $419,035.81 in such taxes. (Id.).

The Debtor borrowed a total of $210,000 from two of its directors, Hackenberry and Sigmund

Rogich, to make payroll in February and March 2011. (Hackenberry Aff. ¶¶ 26-27, A.P. ECF

No. 112; Hackenberry Dep. 62:23-63-13, A.P. ECF No. 88; Rogich Dep. 152:8-15, A.P. ECF

No. 82).

The Debtor made the following payments to Security Essentials after the petition date:

| Date of Payment | Payment Amount |
|:---:|:---:|
| 6/22/2012 | $5,000 |
| 7/13/2012 | $5,000 |
| 8/8/2012 | $5,000 |
| 9/11/2012 | $10,000 |
| 10/10/2012 | $10,000 |
| 11/15/2012 | $10,000 |

(Def.'s Resp. to Pl.'s First Req. for Admis. 105, 113, 121, & 137, A.P. ECF No. 97-6; June

Debtor in Possession Monthly Operating Report ("DIP MOR"), at 20, Lead Case ECF No. 99;

July DIP MOR, at 21, Lead Case ECF No. 112; August DIP MOR, at 18, Lead Case ECF No.

121; September DIP MOR, at 18, Lead Case ECF No. 128; Hackenberry Dep. Ex. 17, A.P. ECF

No. 91-7).  The Court authorized $18,000 in post-petition payments per Cash Collateral Orders

dated May 30, 2012; July 9, 2012; August 9, 2012; and October 18, 2012. (Cash Collateral Or.,

Lead Case ECF Nos. 54, 92, 101, & 125).  Furthermore, the parties stipulated at oral argument

that $27,000 was to be returned to the Trustee by Security Essentials as unauthorized post-

petition payments. (Hr'g on Mo. for Summ. J. & Resp. with Opp'n, A.P. ECF No. 116).

**Discussion and Conclusions of Law**

I.      Count I: Ordinary Preference Claims under 11 U.S.C. § 547(b)

Section 547(b) allows the Trustee to avoid a transfer of an interest of the debtor in

property as preferential if he can prove that the transfer (1) benefited a creditor; (2) was made on

account of an antecedent debt; (3) was made while the debtor was insolvent; (4) was made on or

within 90 days of the debtor filing its bankruptcy petition; and (5) allowed the creditor to receive

more than the creditor would have received if the debtor had filed for a chapter 7 bankruptcy or

if the transfer had not been made at all. *Union Bank v. Wolas*, 502 U.S. 151, 154-55 (1991);

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp)*, 567 F.3d 1291, 1296 (11th Cir. 2009).

Pursuant to § 547(f), the Trustee may rely on the presumption that the debtor was insolvent on

and during the 90 days immediately prior to the debtor's filing of a bankruptcy petition. 11

U.S.C. § 547(f) (2016). *See also Howell v. Brown (In re Pritchett)*, 515 B.R. 656, 659 & n. 6

(Bankr. N.D. Ga. 2014) (finding that debtor was insolvent pursuant to statutory presumption of §

547(f) in granting summary judgment for trustee in avoidable preference action).   The defendant

may rebut the presumption of the debtor's insolvency by presenting evidence that the debtor was

solvent at the time of the pre-petition transfers. *Gordon v. Harrison (In re Alpha Protective

Servs., Inc.)*, 531 B.R. 889, 898 (Bankr. M.D. Ga. 2015); *Hill v. Se. Bank, N.A. (In re Cont'l

Country Club, Inc.)*, 108 B.R. 327, 331 (Bankr. M.D. Fla. 1989).   If the defendant rebuts the

presumption of insolvency, the trustee, who has the ultimate burden on the issue, must prove the

debtor's insolvency. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d

Cir. 1996); *In re Cont'l Country Club, Inc.*, 108 B.R. at 331.

    Once the trustee has carried his burden that the pre-petition transfer is an avoidable

preference, the burden then shifts to the defendant to prove that the pre-petition transfer meets an

exception listed in § 547(c). 11 U.S.C. § 547(g) (2016); *Matter of Anderson-Smith Assoc., Inc.*,

188 B.R. 679, 684 (Bankr. N.D. Ala. 1995).   One exception to the rule against preferential

payments is the "ordinary-course-of-business exception" under § 547(c)(2).   Pursuant to that

exception, the Trustee may not avoid a pre-petition payment as preferential if the defendant

proves that: (1) the payment was made on a "debt incurred by the debtor in the ordinary course

of business," and (2) it was "made in the ordinary course of business or financial affairs of the

debtor and the transferee . . . *or* . . . according to ordinary business terms." 11 U.S.C. § 547(c)(2)

(2016) (emphasis added); *Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac

Leaseco, Inc.)*, 389 F.3d 1205, 1209-10 (11th Cir. 2004); *Johnston Indus., Inc. v. CB&T Bank of

Russell Cty. (In re Johnston Indus., Inc.)*, 357 B.R. 907, 915 (Bankr. M.D. Ga. 2006).   The

exception involves an inquiry into "the conduct of the parties toward one another," "the course of regular dealings between the parties," and "the standards of the relevant industry." *In re Issac Leaseco, Inc.*, 389 F.3d at 1210. Prior to the amendment to the Bankruptcy Code in 2005, the ordinary-course-of-business defense required defendants to prove that the payments at issue were made according to both the ordinary course of business between the parties *and* ordinary business terms as defined by relevant industry standards. *In re Globe Mfg. Corp.*, 567 F.3d at 1297 & n.4 (citing Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, April 20, 2005). The 2005 amendment requires a defendant to show that the payment was made *either* in the ordinary course of business between the parties *or* according to the ordinary business terms of the industry. *Id.* Determining whether the payment was made in the ordinary course of business involves a subjective analysis into "other business dealings between *that* creditor and *that* debtor." *Id.* at 1298. On the other hand, determining whether the payment was made in accordance with the ordinary business terms involves an objective analysis into how the payment comports with relevant industry standards. *Id.* In determining whether the payment was made in the ordinary course of business, courts generally consider the following four factors: "(1) length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) the circumstances under which the payment was made." *In re Johnston Indus., Inc.*, 357 B.R. at 915-16.

The record indicates that there is no genuine issue of material fact as to whether the three payments made by the Debtor to Security Essentials on January 27, 2012, February 17, 2012, and April 12, 2012, respectively, were avoidable preference pursuant to § 547(b). Security Essentials benefited from the three payments by receiving a total of $42,500 within the 90 days

immediately preceding the Debtor's filing of its Chapter 11 petition on April 20, 2012.  Each

payment was made on account of services previously rendered by Security Essentials.

Furthermore, Security Essentials admitted in its Response that each of the three payments were

for their benefit and on account of an antecedent debt owed to them by the Debtor. (Def.'s Resp.

at 12, A.P. ECF No. 110).  Therefore, there is no genuine issue of material fact as to the first two

elements of § 547(b).  The Debtor is presumed to have been insolvent at the time of each

payment because they occurred within the 90 days preceding the petition date, and the Defendant

has not presented evidence that the Debtor was solvent at the time of the transfers to rebut the

statutory presumption.  Furthermore, there is no evidence in the record to indicate that the

Defendant can rebut the presumption of the Debtor's insolvency during the 90 days prior to the

petition date.  Therefore, the Trustee may rely on the statutory presumption to prove the element

of the Debtor's insolvency at the time of the payments.  Lastly, there is no genuine dispute that

the three payments totaling $42,500 enabled Security Essentials to receive more than they would

have as an unsecured creditor in a Chapter 7 proceeding or if the three transfers had never been

made. (Security Essentials Proof of Claim No. 237).

Security Essentials asserts that the three payments are not avoidable preferences because

they were made in the ordinary course of business.  As to the first prong of the exception, it

appears that there is a genuine issue as to material fact.  The record indicates that the Debtor

hired Security Essentials for its consulting services in 2009.  The parties entered into an oral

agreement, obligating the Debtor to make monthly payments to Security Essentials for its

consulting services.  The Debtor incurred such debt for consulting services in its normal course

of offering its private security service to its clients.  Furthermore, the Debtor regularly contracted

both Security Essentials and its president, Hackenberry, for such consulting services dating back

to 2006. Therefore, the source and nature of the debt owed to Security Essentials suggests that

the debt was of the kind incurred by the Debtor in the ordinary course of business. *See Goodman*

*v. Credit Union of Ga. (In re Gaines)*, 502 B.R. 633, 640 (Bankr. N.D. Ga. 2013) (considering

"the source and nature of the debt at issue" to determine whether "the [t]ransfers were in

repayment of a debt that the [d]ebtor incurred in the ordinary course of her financial affairs").

    The second prong of the ordinary-course-of-business exception requires more analysis of

the circumstances surrounding each of the three payments, and the factors as articulated in *In re*

*Johnston Industries, Inc.* serve as guidance to the Court in making its determination. The record

shows that the Debtor and Security Essentials entered into an oral agreement in 2007 for the

Debtor to pay Security Essentials $7,500 per month for services rendered by Security Essentials.

The Debtor made payments for January 2012 and February 2012 but missed its March 2012

payment. The Debtor then resumed payments on April 12, 2012. The payments on January 27,

2012 and April 12, 2012 of $20,000 and $15,000, respectively, were both greater than the

contracted amount of $7,500 per month. Additionally, the record indicates that the Debtor made

the April 12, 2012 payment on the petition date and from an account held by a company other

than the Debtor. The record indicates that the $20,000 payment and the $15,000 payment were

not made in the ordinary course of business. Security Essentials's explanation for the differed

amounts of the payments is that they were "catch-up" payments. While that may be a reasonable

explanation for the April 12 payment being $15,000 to account for the missed payment in March,

it is not a reasonable explanation for why the January 27 payment was $20,000.[6]  Even if the

---

[6] Pursuant to the oral agreement between the Debtor and Security Essentials, it appears that the Debtor owed 13
monthly payments in the total amount of $97,500 to Security Essentials for payments due between April 2011 and
April 2012. However, the Debtor paid Security Essentials a total of $110,000 during that time period. The
difference between the two amounts is $12,500, which is the exact amount of payment in excess from the normal
monthly amount of $7,500 that the Debtor made on January 27. The evidence suggests that if the January payment
was truly a "catch-up" payment, it would have been for the missed June payment and for the total amount of $7,500
rather than $20,000. Therefore, it appears that the January 27 payment was a payment in excess rather than a catch-

$15,000 "catch-up" payment was in the normal course of dealing between the parties, it was made on an account held by an entity other than the Debtor.  Therefore, the record shows that there is no genuine issue for trial on whether the January 27 and April 12 payments were made in the ordinary course of business.  The two payments in the total amount of $35,000 are avoidable preferences under § 547(b) and do not fall within the ordinary-course-of-business exception under § 547(c)(2).  Thus, summary judgment is appropriate as to the two payments, and the Trustee is entitled to a judgment as a matter of law on the $35,000 worth of payments as avoidable preferences.

A genuine issue of material fact appears to exist as to whether the February 17 payment was made in the ordinary course of business between the Debtor and Security Essentials.  Security Essentials argues that this payment was made according to an oral agreement between the parties.  In its Response, Security Essentials offers the deposition testimony of Jeffrey Brinson, former president and majority shareholder of the Debtor, and affidavit testimony of Hackenberry attempting to explain the ordinary course of business between the Debtor and Security Essentials.  According to their testimonies, Security Essentials and the Debtor had an oral agreement that the Debtor would pay Security Essentials $7,500 each month.  Furthermore, the parties did not agree upon a specific date for payment; they only agreed that the payments would be made on a monthly basis.  The February 17 payment appears to be made in accordance with this agreement.  It was made in the agreed amount of $7,500 rather than an amount in excess like the January 27 and April 12 payments.  Furthermore, the record does not indicate anything extraordinary involving the form of payment, whereas the April 12 payment was made from another entity's account. (*See* Hackenberry Dep. Ex. 10, A.P. ECF No. 90-5; Ex. 11, A.P.

---

up payment for a previously missed monthly payment.  Thus, the record indicates that the $20,000 payment was not made in the ordinary course of business due to the difference in amount tendered from the normal amount of $7,500.

ECF No. 90-6).  In light of the testimonial evidence of Brinson and Hackenberry, the Court

determines that a reasonable fact finder could find that the February 17 payment was made by

the Debtor in the ordinary course of business between the parties.

On the Trustee's Motion for summary judgment on the 90-day preference claims, the

Court will GRANT summary judgment as to the January 27 payment of $20,000 and the April

12 payment of $15,000, for a total of $35,000.  The Court will DENY the Trustee's Motion as to

the February 17 payment of $7,500.

II.     Count I: Insider Preferential Payments under 11 U.S.C. § 547(b)

A) Insider Status

The trustee may avoid pre-petition transfers made by the debtor between 90 days and one

year prior to the debtor's filing of a bankruptcy petition if the transferee was an "insider" at the

time of the transfers. 11 U.S.C. § 547(b)(4)(B) (2016).  As enumerated in § 101(31)(B), an

"insider" to a corporate debtor includes the following:  "[a] director of the debtor; [an] officer of

the debtor, [a] partnership in which the debtor is a general partner; [a] general partner of the

debtor; or [a] relative of a general partner, director, officer, or person in control of the debtor."

11 U.S.C. § 101(31)(B) (2016).  The Code's list of insiders is non-exhaustive.  However, "[f]or

an entity not specifically enumerated in § 101(31) to qualify as an insider, '[t]he transferee's

relationship to the debtor must be very closely analogous to those relationships specifically set

forth in § 101(31).'" *Gordon v. Vongsamphanh (In re Phongsavath)*, 328 B.R. 895, 897 (Bankr.

N.D. Ga. 2005) (quoting *Yoppolo v. Lindecamp (In re Fox)*, 277 B.R. 740, 744 (Bankr. N.D.

Ohio 2002)).  In determining whether a transferee is a "non-statutory insider," "courts have

focused on the closeness of the relationship between the debtor and the creditor *and* whether the

transactions between them were conducted at arm's length." *Id.* (emphasis added) (citing *Matson*

*v. Strickland (In re Strickland)*, 230 B.R. 276, 285-86 (Bankr. E.D. Va. 1999); *Damir v. Trans-Pac. Nat'l Bank (In re Kong)*, 196 B.R. 167, 171 (N.D. Cal. 1996) (parenthetical omitted)). *Accord Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables Ltd.)*, 144 F. App'x 72, 75 (11th Cir. 2005).

In *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, the Tenth Circuit held that "a creditor may only be a non-statutory insider of a debtor when the creditor's transaction of business with the debtor is not at arm's length." 531 F.3d 1272, 1280 (10th Cir. 2008). The issue before the Tenth Circuit was whether a corporate-creditor was a non-statutory insider to a corporate-debtor. *Id.* at 1274. The corporate-creditor was the exclusive manufacturer for the corporate-debtor, who was the exclusive distributor in North America for the corporate-creditor. Their business relationship began when the two parties entered into a distribution agreement two years prior to the corporate-debtor's filing of a chapter 7 petition. Per the agreement, the Chief Executive Officer (the "CEO") of the corporate-creditor was named to the board of directors of the corporate-debtor. The CEO attended every board meeting and had access to the corporate-debtor's financial information. However, the CEO was not involved in decision-making regarding payments to the corporate-creditor nor was he involved in the day-to-day business between the corporate-debtor and the corporate creditor. Rather, the corporate-creditor's Chief Financial Officer handled the day-to-day business between the corporate-creditor and the corporate-debtor. Additionally, the corporate-creditor was a 10.6% equity holder of the corporate-debtor. *Id.*

The Tenth Circuit determined that the bankruptcy court erred in holding that the corporate-creditor was a non-statutory insider. *Id.* at 1278. The court reasoned that the bankruptcy court made no findings that the transaction of business between the corporate-

creditor and corporate-debtor were not at arm's length. *Id.*  Additionally, the bankruptcy court

held that the corporate-creditor was a non-statutory insider "despite the absence of any control,

intention to control, or undue influence by the [CEO] of the corporate creditor" over the debtor.

Rather, the bankruptcy court based its holding solely on the closeness of the relationship between

the parties. *Id.*  The Tenth Circuit noted legislative history evidencing Congressional intent to

define an insider as "one who has a sufficiently close relationship with the debtor that his

conduct is made subject to closer scrutiny *than those dealing at arms [sic] length with the*

*debtor.*" *Id.* at 1279-80 (quoting S. Rep. No. 95-989, at 25 (1978), 1978 U.S. Code Cong. &

Admin. News 5787, 5810; H.R. Rep. No. 95-595, at 312 (1977)) (emphasis in original)

(alteration in original).  Accordingly, the trustee bears the burden of proving that "the creditor

and debtor did not operate at arm's length *at the time of the challenged transaction*" for a

bankruptcy court to find that the creditor is a non-statutory insider. *Id.* at 1280.

The trustee in that case argued that the corporate-creditor was a non-statutory insider

because it had access to inside information through the CEO's service on the debtor's board of

directors.  Additionally, the trustee argued that the corporate-creditor was a "de-facto director" of

the corporate-debtor by virtue of the CEO being a director, and therefore, the corporate-creditor

was a non-statutory insider. *Id.* at 1281.  The Tenth Circuit was not persuaded by these

arguments. *Id.* at 1282.  The court determined that the CEO was "sensitive to 'potential conflicts

of interest' and operated at arm's length with the Debtor" rather than using his role as director

"to enrich the creditor." *Id.* at 1281-82.  Furthermore, the court ruled that the CEO's "theoretical

access to inside information in this case does not confer non-statutory-insider status on [the

corporate-creditor]." *Id.* at 1280 n.7.

In the instant case, the Trustee argues that Security Essentials is a statutory insider by virtue of Hackenberry's position on the board of directors of the Debtor.  Hackenberry is a statutory insider under § 101(31)(B)(i) because he is a director of the Debtor.   He reasons that Security Essentials is wholly-owned by Hackenberry and "pseudonymous" with Hackenberry. Therefore, he contends that Security Essentials is a statutory insider because Hackenberry is a statutory insider.

Security Essentials refutes the Trustee's contentions by presenting evidence of Hackenberry's involvement on the Debtor's board of directors.  Security Essentials contends that Hackenberry had no authority or control over the management of the Debtor.  According to affidavit testimony by Hackenberry, the board never met in person or by telephone during 2010 and 2011. (Hackenberry Aff. ¶ 23).  Rather, Hackenberry's only communications regarding business of the Debtor were telephone conversations with Brinson, the 100% owner of the Debtor.  As a board member, Hackenberry did not receive data regarding the Debtor's finances. Furthermore, Brinson was able to do "anything he wanted to do, with or without Board approval." (Id.).

The evidence presented by Security Essentials suggests that a genuine issue of material fact exists as to whether it is an insider of the Debtor.  First, the Court notes that Security Essentials itself was not a director of the Debtor.  Rather, its president was a director.  *See In re U.S. Medical, Inc.*, 531 F.3d at 1276 n.3 (noting that the "[CEO of the corporate-creditor] was a director on [the corporate-debtor's board, but the question . . . [was] whether [the creditor], as a corporation, was an insider, not [the CEO]").  Because Security Essentials was not of the types of statutory insiders enumerated in § 101(31)(B), it was not a statutory insider.  Therefore, the

16

Trustee must prove that Security Essentials was a non-statutory insider to receive the benefit of the extended insider-preference reach-back period.

The Court finds that a reasonable fact finder could conclude that Security Essentials was not a non-statutory insider.  The record shows that the pre-petition payments made between April 20 and January 13, 2011 were made according to an oral agreement between the parties.  All payments made during the insider-preference period were in the agreed upon amount of $7,500. The record does not indicate that Security Essentials and the Debtor were not dealing at arm's length when the parties entered into that agreement.  Furthermore, the evidence does not suggest that Security Essentials or Hackenberry, acting on behalf of Security Essentials, controlled, intended to control, or unduly influenced the Debtor to enter into the oral agreement or to pay Security Essentials throughout the insider-preference period.  It appears that Hackenberry and the rest of the board of directors were no longer involved in directing the Debtor during the insider-preference period.  According to Hackenberry's affidavit testimony, "the Board ceased to function" by beginning of 2010, a date which preceded the first alleged insider-preferential payment on April 20, 2011.  He also states in his affidavit that the board never met, in person or by telephone, during the years 2010 and 2011.  Therefore, a genuine issue of material fact exists as to whether Security Essentials is a non-statutory insider.

B)  Debtor Insolvency

The trustee bears the burden of proving all the elements of § 547(b) to avoid an insider-preferential payment, including that the debtor was insolvent during the insider-preference period because the statutory presumption of debtor insolvency under 11 U.S.C. § 547(f) does not apply. The Code defines insolvency as "the sum of [an] entity's debts [being] greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32)(A) (2016).

In his Statement of Uncontested Facts, the Trustee states that the Debtor is presumed to be insolvent at the time of the insider preferential transfers because "it was not paying its debts as they fell due." (Pl.'s Statement of Uncontested Facts, 5:29). The Trustee bases this fact on the presumption of insolvency as provided by the Federal Debt Collection Procedures Act (the "FDCPA"). *See* 28 U.S.C. § 3302(b) ("A debtor who is generally not paying debts as they become due is presumed to be insolvent."). At least one court has cited to the FDCPA on the issue of debtor insolvency at the time of a preferential transfer to an insider, but that court did not analyze the presumption of insolvency under the FDCPA. *See Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th Cir. 2008) ("Under Indiana and federal law, a debtor is insolvent if the fair value of its debts exceeds the fair value of its assets." (citing 28 U.S.C. § 3302; Ind. Code § 32-18-12)).

In *Kelley v. Speciale (In re Gregg)*, this Court applied a "flexible-totality-of-the-circumstances test" to determine whether a debtor was generally paying its debts as they came due in a fraudulent conveyance action under § 544(b)(1). 2013 WL 3989061, *15 (Bankr. M.D. Ga. 2013). This test is typically used by courts in determining whether the debtor is generally not paying its debts in the context of the filing of an involuntary petition against the debtor under § 303(h)(1). *Id.* Courts "focus[] on the number of unpaid claims, the amount of the claim, the materiality of nonpayment and the overall conduct of the debtor's financial affairs." *Id.* (quoting *In re Knight*, 380 B.R. 67, 74 (Bankr. M.D. Fla. 2007)).

To prove insolvency, the Trustee offers the affidavit of Christopher Edwards, a certified public accountant ("CPA") with 28 years' worth of experience. Edwards analyzed the following documents in making his affidavit testimony: (1) the unaudited financial statement for 2010 as prepared by Rodney Hunter, CPA; (2) the audited financial statement for 2009 as prepared by

Rodney Hunter, CPA; (3) the Internal Revenue Service's ("IRS") Proof of Claim for

$2,867,753.62;[7] (4) Testimony from Rodney Hunter; (5) Pleadings related to a judgment for

$1,863,221.32 in favor of Omniplex World Services Corporation ("Omniplex") against the

Debtor; (6) Testimony of Jeffrey Brinson; (7) Email Correspondence between Brinson and City

National Bank in January 2011; (8) the Debtor's Petition and Schedules; (9) Testimony of Paul

Hackenberry; and (10) Testimony of Sigmund Rogich.   After reviewing the documents, he

concluded that the Debtor was generally not paying its debts as they became due at the end of

2010 and during 2011, and therefore, the Debtor should be presumed to have been insolvent

during that time pursuant to the presumption of insolvency under the FDCPA.   According to

Edwards, the 2010 financial statement showing a shareholder's equity of $2,997,309.00 is not a

true representation of the Debtor's worth.   He reasons that Hunter, the CPA who created the

financial statement, omitted the Omniplex debt and the IRS debt from the financial statement.

Additionally, Edwards opines that Hunter failed to make an adjustment for the "fair value" of

assets and liabilities for the purposes of determining insolvency under § 101(32).   Furthermore,

Edwards shows the following debts were due and owing by the Debtor: (1) judgment for over

$1.8 million that was to be paid to Omniplex under an installment agreement in October 2010

but was breached by the Debtor in early 2011; (2) over $2 million in Federal Insurance

Contributions Act ("FICA") taxes from the third quarter of 2010 to the end of the second quarter

of 2011; (3) overdraft fees owed to Ameris Bank per an arrangement between the Bank and the

Debtor; (4) $110,000 borrowed from Hackenberry to assist the Debtor in making payroll; (5)

$100,000 borrowed from Rogich to assist the Debtor in making payroll; and (6) lease payments

owed to Fred Taylor Company.

---

[7] This figure represents the IRS's total claim.  It has a secured claim for $1,943,422.83, an unsecured priority claim
for $851,226.29, and a general unsecured claim for $73,084.50.

Security Essentials refutes the reliability of Edwards's report because Edwards only reviewed the 2009 audited and 2010 unaudited financials. It argues that these financial statements do not cover the time period the alleged insider preferences were made. Furthermore, Security Essentials offers the deposition testimony of Rodney Hunter, who has been a CPA since 1982 and performed accounting services for the Debtor from 2009 until sometime after the filing of the Debtor's petition, to show that the Debtor was not insolvent in 2009 or 2010. (Hunter Dep. 6:13-7:11, A.P. ECF No. 87-2). Hunter testified that the 2009 and 2010 financial statements prepared by him would not suggest that the Debtor was insolvent during those years. (Id. at 111:19-113:5).

The Court finds that there is a genuine issue of material fact as to whether the Debtor was insolvent during the insider preference period. The Trustee has offered expert testimony stating that the debtor was insolvent pursuant to the presumption of insolvency under the FDPCA. However, there is no evidence that the Debtor was insolvent, as defined by the Code, at the time of each transfer between April 20, 2011 and January 13, 2011.

The Court notes that it has previously applied the presumption of insolvency under the FDCPA in a fraudulent conveyance action. *See generally In re Gregg*, 2013 WL 3989061, at *15. Assuming arguendo that the presumption of insolvency under the FDCPA applies in preference actions, a reasonable fact finder could determine that the Debtor was solvent during the insider preference period. The Trustee has offered evidence of unpaid claims, the amount of those claims, the materiality of nonpayment of those claims, and the overall conduct of the debtor's financial affairs to show the Debtor's inability to pay its debts as they became due. Specifically, the Trustee has offered evidence of six debts in amounts ranging from $100,000 to $2,867,753.62 that were due and owing at the beginning of 2011. However, the Court finds that

a reasonable fact finder could determine that the Debtor was solvent under the Code definition of insolvency.  No evidence has been presented in the form of an insolvency analysis under the balance sheet test, and the Trustee concedes that point.  Furthermore, Edwards's opinion on insolvency does not appear to take into account the financial status of the Debtor during the time of the alleged insider-preferential transfers.  Rather, he bases his opinion on the financial statements of 2009 and 2010, and Hunter testified that those financial statements do not suggest that the Debtor was insolvent.  The record does not show that the sum of the Debtor's debts was greater than all of the Debtor's assets at fair value at the time of the insider-preferential transfers.  Therefore, the Court finds it inappropriate on a motion for summary judgment to draw the inference, based on a presumption of insolvency under the FDCPA, that the Debtor was insolvent during the insider preference period.  The issue of insolvency during the insider preference period is better suited for trial where the parties may further present evidence of the Debtor's insolvency.  The Court will also be able to consider further evidence on the totality of the circumstances surrounding the Debtor's general ability to pay its debts as they became due during the insider preference period.[8]  Furthermore, the Court will have the opportunity to weigh the credibility of each party's testimonial evidence to better determine whether the Trustee is able to carry his burden of proving that the debtor was insolvent during the insider preference period.

---

[8] Assuming arguendo that the FDCPA applies to preference actions under § 547, the Court notes Security Essentials argument that the Trustee's expert, Edwards, "did not engage in anything like the analysis required to focus on the 'number of unpaid claims, the amount of the claim, the materiality of nonpayment and the overall conduct of the debtor's financial affairs.'" (Def.'s Resp., at 13, A.P. ECF No. 110).  Security Essentials reasons that Edwards did not review "cost of sales or operating expenses" for the Debtor during the insider-preference period, but rather his opinion is premised entirely on the six debts mentioned above.  Security Essentials also refutes that the overdraft privileges provided by Ameris Bank were indicative of an ability to pay debts as they became due.  Security Essentials contends that these overdraft privileges were provided in lieu of a line of credit, and Hunter's deposition testimony suggests that these privileges were in substitute for a line of credit. (Edwards Aff. Ex. L, Hunter Dep. 39:14-40:8, A.P. ECF No. 100-13).

C) Ordinary-Course-of-Business Defense

The record indicates that a genuine issue of material fact exists as to whether the payments made by the Debtor to Security Essentials during the insider preference period were made in the ordinary course of business between the parties. Again, the parties had an oral agreement that the Debtor would pay Security Essentials $7,500 per month for services rendered. The record does not indicate that there was a due date for these payments. Rather, the oral agreement only obligated the Debtor to pay Security Essentials monthly for its services. The Debtor missed a payment in June 2011. The Trustee argues that "[t]he regular payment schedule was interrupted with the failure to pay the June payment, and the Debtor never caught up again." The Court notes that the Debtor was operating with a balance owed of $7,500 for June 2011 when it continued making monthly payments of $7,500 from July 14, 2011 to January 13, 2012. However, Security Essentials has offered evidence that missed payments and resulting late payments were not uncommon occurrences in the business dealings between it and the Debtor. Furthermore, the Trustee's argument that the payments were extraordinary due to their tardiness is based on the assumption that there was an invoice date of the first of the month for each monthly payment. While that is a reasonable assumption, the Court must draw all inferences in favor of Security Essentials as the non-moving party. Other than the missed June payment, the Debtor made a monthly payment to Security Essentials in the agreed upon amount from April 20, 2011 to January 13, 2012. Considering the evidence presented by Security Essentials, the Court finds that a genuine issue of material fact exists as to whether the payments made from April 20, 2011 to January 13, 2011 were made in the ordinary course of business between the Debtor and Security Essentials.

III.    Count IV: Unauthorized Post-Petition Transactions under 11 U.S.C. § 549(a)

Pursuant to §549(a), "the trustee may avoid a transfer of property of the estate that occurs after the commencement of the case [] and . . . that is not authorized under [the Code] or by the court." 11 U.S.C. § 549(a) (2016).  At oral argument, the Trustee alleged that the total amount of post-petition payments was $45,000.  In its Response, Security Essentials admits that only $18,000 in post-petition payments was authorized by orders of this Court.  Therefore, any amount received in excess of $18,000 is avoidable under § 549(a).  At oral argument, the parties stipulated that Security Essentials must return $27,000 as unauthorized post-petition payments.  Based on the stipulation, no genuine issue of material fact exists as to $27,000 worth of post-petition payments being avoidable under § 549.

The parties made that stipulation under the assumption that Security Essentials received a total of $45,000 in post-petition payments.  In his Motion, the Trustee alleges that the Debtor made $55,000 worth of post-petition payments to Security Essentials.  The difference between the two totals is the alleged $10,000 payment on December 7, 2012.  In his Motion, the Trustee contends that this payment "was identified in litigation brought by Bank of America against [the president of the Debtor]."  The Court recognizes that there may be a genuine issue of material fact as to the total amount of post-petition payments made by the Debtor to Security Essentials.  However, the Trustee is also entitled to summary judgment to the extent Security Essentials received more than $27,000 worth of unauthorized post-petition payments.

IV.    Counts V and VI: Initial or Immediate Transferee Liability under 11 U.S.C. § 550

Section 550(a) allows the trustee to recover the property or the value of such property that the trustee avoided under §§ 544, 545, 547, 548, 549, 553(b), or 724(a). 11 U.S.C. § 550.  The trustee may recover such property from the initial or immediate transferee. *Id.*  The Trustee

in the instant case has carried his burden in showing that no genuine issue of material fact exists

as to whether $35,000 worth of pre-petition preferential payments and $27,000 worth of

unauthorized post-petition payments are avoidable pursuant to §§ 547 and 549, respectively.  It is

undisputed that Security Essentials is the initial transferee of the payments made by the Debtor

during the insider preference period.  During the 90-day preference period, Security Essentials

was the initial transferee of the January 27 and February 17 pre-petition payments.  The last pre-

petition payment was made through an account held by ACE.  The record shows that Security

Essentials was the initial transferee of this payment because the payment actually came from the

Debtor due to ACE being a "dummy corporation" used by the Debtor to pay the Debtor's debts

once its Bank of America account was seized.  At the very least, Security Essentials appears to

have been the immediate transferee of the payment from the Debtor to ACE.  As for post-petition

payments made by the Debtor, it is undisputed that Security Essentials was the initial transferee.

Therefore, the Trustee is entitled to recover a total of $62,000 from Security Essentials as the

initial or immediate transferee pursuant to § 550.  The Trustee will be entitled to recover other

payments made between the Debtor and Security Essentials to the extent the Trustee is able to

prove that those payments are avoidable under §§ 547 and 549.

### Conclusion

The Court concludes that the Trustee is entitled to partial summary judgment as to Count

I.  The Trustee has shown that no genuine dispute of material fact exists as to the January 27,

2012 and April 12, 2012 payments being avoidable under § 547(b) as preferential payments

made on or within the 90 days prior to the petition date.  Additionally, Security Essentials cannot

show that these payments were made in the ordinary course of business.  Therefore, the Court

will GRANT summary judgment as to $35,000.  However, the Trustee is not entitled to summary

judgment as to the February 27, 2012 payment of $7,500 made within the 90 days prior to the

petition date because a genuine dispute as to material fact exists as to whether that payment was

made in the ordinary course of business between the Debtor and Security Essentials.  The Court

determines that the Trustee is not entitled to summary judgment as to his insider preference

claims under Count I because genuine disputes of material facts exist as to the following issues:

(1) whether Security Essentials was an insider at the time of the transfers; (2) whether the Debtor

was insolvent during the insider preference period; and (3) whether the payments made during

the insider-preference period were made in the ordinary course of business between the Debtor

and Security Essentials.  Therefore, the Court will DENY summary judgment as to the $67,500

alleged as pre-petition preferential payments to an insider.

The Trustee is entitled to partial summary judgment as to Count IV.  The parties

stipulated at oral argument that Security Essentials received $27,000 worth of unauthorized,

post-petition payments.  Therefore, the Court will GRANT summary judgment as to $27,000 and

will DENY summary judgment as to $18,000 per the parties' stipulation at oral argument.

Lastly, the Trustee is entitled to summary judgment as to Counts V and VI.  The Trustee

has shown that there is no genuine issue of material fact as to Security Essentials being the initial

or immediate transferee of the transfers underlying the Trustee's §§ 547 and 549 claims.

Therefore, the Trustee is entitled to recover the total of $62,000 from Security Essentials

pursuant to § 550.  Additionally, the Trustee is entitled to recover from Security Essentials any

other transfer he is able to prove is avoidable under those provisions.

The Court will enter an order in accordance with this Memorandum Opinion.